## EXCELSIOR-LEADER LAUNDRY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9221.    Promulgated September 22, 1927.

The excess of insurance received over the book value of machinery and equipment destroyed by fire was so invested in like property as to be exempt from tax under the provisions of section 234 (a) (14), Revenue Act of 1921.

*John O. Bigelow, Esq.,* and *Edward R. Burt, C. P. A.,* for the petitioner.

*J. Harry Byrne, Esq.,* for the respondent.

This appeal is from the determination of a deficiency of $6,909.66 arising from the disallowance of petitioner's deduction from its income for 1921 of $22,384.53 cash collected on fire insurance policies in excess of the book value of the assets destroyed. At the hearing petitioner abandoned that part of its claim relating to the deduction of use and occupancy insurance, amounting to $6,720.48,

and the premium of $1,000 on bundle insurance, a total of $7,720.48, leaving the disallowance of a deduction of $14,664.05 in controversy.

### FINDINGS OF FACT.

From some time prior to January 1, 1921, the Excelsior-Leader Laundry Co., a Missouri corporation, conducted a laundry in St. Louis, Mo. George W. Burley, B. T. Kearns and Charles B. Schaum each owned one-third of its capital stock. At the same time George W. Burley and B. T. Kearns each owned one-half of the capital stock of the Leader Laundry Co., a Missouri corporation, also located in St. Louis, except that their wives each held a qualifying share. The Excelsior Company had a maximum earning capacity of $4,000 per week and the Leader Company of $2,500 per week. The two were conducted independently of each other. The Excelsior Laundry was conducted in a leased building. The Leader Company owned its building.

On the evening of May 23, 1921, the Excelsior Laundry building and practically all of its contents, were destroyed by fire. Thereafter, on the night of the 23rd, the stockholders of the two companies met and discussed plans for the immediate future, and continued their discussion until late the next morning, with the result that the Leader Company opened its doors to the Excelsior Company so that, in addition to its own force, as many of the employees of the latter as could be accommodated in the laundry building of the Leader Company continued work and as much of the laundry work of the Excelsior Company as possible was done in the Leader Company building. Charles B. Schaum was employed on the morning of May 24th to take entire charge of the work of the two companies, and continued in such employment throughout the remainder of the calendar year. On May 31, Mrs. Mary A. Kearns and Mrs. Hattie A. Burley, wives of Messrs. Kearns and Burley, resigned their respective positions of vice president and general manager and director of that company and Chester P. Schaum, having purchased a one-third interest in the Leader Company, was on the same day elected to the positions thus made vacant. From that day on the laundry business of the two corporations was conducted as nearly as practicable as if they were one business organization, with identical stockholders, directors, officers and plant.

Insurance for the fire losses of the Excelsior Company was paid as follows:

| | |
|---|---:|
| Customers' bundle insurance, approximately | $26,000.00 |
| Premium insurance on bundles | 1,000.00 |
| Use and occupancy insurance | 6,720.48 |
| Machinery and fixtures | 52,792.56 |
| Total | 86,513.04 |

These payments were mostly made in July, 1921. The bundle insurance all went to customers for laundry work which they had in the building at the time of the fire. The policies were written and losses paid on this account. The use and occupancy insurance was for deprivation of laundry facilities during a stated number of days.

On the date of the fire the book value of the property destroyed was $22,384.53 less than the insurance so paid. This was all expended for new machinery of a character similar or related in service to that destroyed, which was installed in a new building begun by the two companies and completed by the consolidated company. The petitioner claimed credit for this in its tax return for the year 1921 under the provisions of section 234 (a) (14). The respondent disallowed the claim and held that the whole amount was taxable gain. The petitioner admitted at the hearing that the amounts received as insurance on bundles and for use and occupancy were taxable, thus reducing the amount of income in controversy to $14,664.05.

The following resolutions were read into the record from the minutes of a meeting or meetings of the stockholders of the Leader Laundry Co. held August 1, 1921:

RESOLVED: That this corporation join the Excelsior Laundry Company, a corporation, in borrowing from the Lafayette South Side Bank the sum of $100,000 payable as follows: * * *

RESOLVED: That the proper officers of this corporation execute for and in behalf of this company, the note last above described and mentioned, and for the purpose of securing the same, to also execute a deed of trust to Otto J. Gossrau, trustee for Oscar L. Kupperer, conveying the following described real estate and personal property situated in the city of St. Louis, State of Missouri, to-wit: * * * notes to bear interest from maturity at the rate of 8 per cent per annum; all the said notes to be also executed by the Excelsior Laundry Company.

RESOLVED: That this company borrow from the Excelsior Laundry Company all of its available cash and execute the company's note therefor, payable on or before 5½ years after date, provided the loan obtained this day from the Lafayette South Side Bank in the sum of $100,000 shall have been paid for and discharged, and if not then whenever such loan shall have been paid, said note to include the purchase price of its machinery now situated and located at 1012 North Grant Avenue in the City of St. Louis, Missouri.

RESOLVED: That the proper officers of this corporation accept a bill of sale made to it of all the machinery and equipment of the Excelsior Laundry Company formerly used or intended to be used in connection with the operation of that company's business and situated and located at 1012 North Grant Avenue, in the City of St. Louis, Missouri and to pay the Excelsior Laundry Company the sum of $5,000 therefor.

On the same date the Excelsior Laundry Company adopted the following resolutions:

RESOLVED: That all the cash and bonds belonging to this corporation be loaned to the Leader Laundry Company for a period of 5½ years from and after the date hereof without interest and until such time as the $100,000 loan

this day made by this company and the Leader Laundry Company from the Lafayette South Side Bank be paid for and discharged and that this company accept the note of the Leader Laundry Company in accordance with the terms hereof, and that there shall be included in the said notes the purchase price of machinery and equipment in the sum of $5,000, the consideration moving to this company from the Leader Laundry Company for the purchase of said equipment.

RESOLVED: That the proper officers of this corporation execute and deliver to the Leader Laundry Company a bill of sale conveying to it all the machinery and equipment of this corporation formerly used or intended to be used in connection with the operation of this company's business and situated and located at 1012 North Grant Avenue in the City of St. Louis, Missouri, for the sum of $5,000 to be included in note to this company as specified in the foregoing resolutions.

Entries read into the record from the cash book and journal of the Excelsior Laundry Co. indicate clearly that action was taken in accordance with these resolutions insofar as they relate to loans from the Excelsior Laundry Co.

By the first of July, 1921, all preparations had been made and the plans drawn for the erection of a new building on vacant land belonging to the Leader Company, designed to accommodate and take care of the custom of both of the old companies. The building operations were pushed as rapidly as possible and on March 5, 1922, the old Leader Company building was vacated and the new occupied. All the insurance money received by the Excelsior Company for itself, except that for premiums and bundles, was for loss of machinery, furniture and equipment, and this was all expended for property of a character similar or related in service or use to the property so destroyed. The old building remained vacant a short time and was then leased to outside parties.

December 21, 1921, the capital stock of the Excelsior Laundry Co. was increased from $30,000 to $90,000. In petitioner's tax return for 1921 it reported the Excelsior Company's assets as follows:

| | |
|---|---|
| Surplus | $39, 061. 46 |
| Fire Loss | 24, 622. 22 |
| Capital stock | 90, 000. 00 |
| Total | 153, 683. 68 |

The following language appears on the minutes of a special meeting of the stockholders of the Excelsior Laundry Co., bearing date of December 22, 1921:

A proposition was thereupon submitted by Bernard T. Kearns to amalgamate consolidate and unite this company with the Leader Laundry Co., as by the laws of this State provided, such consolidation and amalgamation as the capital stocks, debts, properties, assets or franchises of said companies, to be upon the following terms, to wit:

1. That the said consolidation and amalgamation shall be made forthwith and that the name and style of said consolidated corporation shall be "Excel-

sior-Leader Laundry Co." and that it shall continue in existence for a period of fifty years.

2. That the several capital stocks, debts, assets and properties both real and personal, of every kind and character, wheresoever situated, including good will and franchises held, owned or possessed by each of said corporations, shall be vested in said consolidated and amalgamated corporation, Excelsior-Leader Laundry Co. as fully as the same are now severally held, owned and enjoyed by them respectively, subject, however, to all of the conditions, stipulations, contracts, liens, claims and charges thereon, and to all debts and obligations of the said respective corporations; and the consolidated corporations shall fully complete, carry out, and perform all valid conditions, stipulations and contracts heretofore made by said corporations or either of them, and shall pay and discharge all of the liens, claims and charges heretofore created or suffered by either of them on their respective properties, shall pay and discharge all valid debts and obligations of every name, kind and description heretofore incurred or assumed by, or now existent against either of said corporations.

On that day the board of directors approved the proposition to consolidate the two companies and the following action was taken:

It was thereupon moved, seconded and unanimously carried that the president and secretary of this company execute such agreement and articles of consolidation, and such other papers, as may be necessary to file with the proper officers of this State to effect and completely carry out such consolidation, and that they be further authorized and empowered to execute all papers, documents and instruments as may now or hereafter be necessary to properly and legally transfer the properties, franchises, assets and liabilities of this company to such consolidated corporation, in such manner that the rights of the creditors of this corporation shall not be affected or impaired, and the rights of the stockholders of this corporation fully protected in such consolidated corporation. And the officers of this company are hereby fully authorized, directed and empowered to so make, execute and deliver any and all instruments, deeds, conveyances and papers, which are now or may at any future time be necessary to fully effectuate the transfer of all the properties, real, personal and mixed, of every character, to such consolidated company, its successors and assigns.

The Leader Laundry Co.'s stockholders and directors took like action on the same day. On the 23rd of December, a certificate of consolidation was signed and sealed by the Secretary of State of the State of Missouri. The books of the consolidated company were opened January 1, 1922.

In March, 1922, after the new building had been completed and all the machinery and equipment installed, the consolidated Excelsior-Leader Laundry Co. had a maximum earning capacity of $10,000 per week.

OPINION.

LANSDON: The petitioner having abandoned its claim for deduction from its income of the $7,720.48 received for use and occupancy and bundle insurance, the only question before the Board for decision

11340°—28——15

is whether the amount collected for loss of machinery and equipment in excess of the book value thereof at the time of the fire was so invested as to require that it be included in income, within the purview of section 234 (a) (14) of the Revenue Act of 1921.

Section 234 (a) (14), insofar as relevant here, is as follows:

SEC. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*　　　\*　　　\*.　　　\*　　　\*　　　\*　　　\*

(14) If property is compulsorily or involuntarily converted into cash or its equivalent as a result of (A) its destruction in whole or in part, \* \* \* and if the taxpayer proceeds forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, to expend the proceeds of such conversion in the acquisition of other property of a character similar or related in service or use to the property so converted, \* \* \* then there shall be allowed as a deduction such portion of the gain derived as the portion of the proceeds so expended bears to the entire proceeds.

We have found as facts that the Excelsior Laundry Co. owning the machinery and equipment destroyed, immediately affiliated itself with the Leader Laundry Co. and was continuously so affiliated until December 22, 1921, when by the joint and several action of the two companies, they were consolidated into one company bearing the names of both; that a tax return was rendered by and for the consolidated company for the full year, showing on its face that it included the earnings and gains and the disbursements of the original companies during the year, both as independent and affiliated companies, and also of the consolidated company.

The effect of the consolidation was to extinguish the two original companies and establish the consolidated or amalgamated company in their stead. The revised statutes of the State of Missouri for 1919 under which the consolidation was effected, provides as follows:

SEC. 10,165. Consolidation of companies, how effected.—Any two corporations now existing under general or special laws, or which may be hereafter created, whose objects and business are in general of the same nature, may amalgamate, unite and consolidate said corporations and form one consolidated corporation, holding and enjoying all the rights, privileges, power, franchises and property belonging to each, and under such corporate name as they may adopt or agree upon; such consolidation shall be made by agreement in writing, by or under the authority of the board of directors and the assent of the owners of at least three-fifths of the capital stock of each of said corporations, and a certificate of the fact of such consolidation, with the name of the consolidated company, shall be recorded in the office of the recorder of deeds of the city or county in which such corporation is located and a certified copy of such recorded instrument shall be filed in the office of the secretary of state. *Provided,* that no such consolidation shall in any manner affect or impair the rights of any creditors of either of said corporations.

The Court of Appeals of the State of Missouri has decided that:

The consolidation produces a new corporation which succeeds to all the rights and liabilities of the old corporations and a surety on a bond to one of the con-

solidating concerns remains liable for the default of his principal to the new corporation. *Springfield, etc., Co.* v. *Hobart*, 98 A. 227, 68 S. W. 942. In a suit pending against one of the consolidating corporations at the time of consolidation, plaintiff may proceed to judgment against the original corporation, and the united corporation need not be made a party. *Wells* v. *Electric Co.*, 108 A. 607, 84 S. W. 204.

See also *Queen City Furniture & Carpet Co.* v. *Crawford*, 127 Mo. 356; 30 S. W. 163.

If the Excelsior Company had made the purchase of the machinery and equipment direct and installed it in the new building, there could have been no question as to the allowance of the deduction now claimed. *Piedmont-Mt. Airy Guano Co.*, 3 B. T. A. 1009; *Cotton Concentration Co.*, 4 B. T. A. 121; *The Davis Co.*, 6 B. T. A. 281. But, it appears to have loaned all its cash and bonds to the Leader Company. Be that as it may, the money derived from the fire loss was all invested in new machinery which was installed with due expedition in the new building, the erection of which was paid for from moneys borrowed by the two companies on their joint note. The interests of the two companies were identical in that they were both owned by the same stockholders, each having a like interest with each of the other two in the stock, and the officers of the two companies were identical.

Prior to the close of the year for which the return was rendered, the two companies had become amalgamated or consolidated into one, and had ceased to exist as separate entities. But one return, that of the amalgamated company, was rendered for the 12-month period and the respondent accepted it. This indicates that both considered that at the close of the year there was but one of the three legal entities then in existence and that as to matters of Federal income and excess-profits taxes, this one represented both of the others. Under such circumstances, it would be a far cry to hold that the methods resorted to in the expenditure of the gain resulting from the excess of the insurance over the book value of the machinery and equipment destroyed were such as to deprive the petitioner of the benefits of section 234 of the Revenue Act of 1921. We see nothing in the methods adopted by the two companies destructive of the property rights of either, but even if the methods had been such as to cast a doubt as to the intention of the parties at some time during the year, it is from results rather than methods that the allowance or disallowance of deductions under section 234 (a) (14) must be determined. The property was involuntarily converted into cash as a result of its destruction. The petitioner proceeded forthwith in good faith to expend and did expend the proceeds of the conversion in the acquisition of other property of a character similar or related in service or use to the property so converted. Neither the methods fol-

lowed by it, nor the results obtained were in contravention of the regulations prescribed by the Commissioner of Internal Revenue under this section made and provided.

Reviewed by the Board.

> *The deficiency will be determined in accordance with this opinion, on 15 days' notice, under Rule 50.*